**Norman A. GORDON, Plaintiff in Error,**

v.

**Nelson N. CLABAUGH and Forrest C. Blackstock, as Assignees of Grant Manufacturing Co., a Dissolved Partnership, Defendants in Error.**

No. 37984.

Supreme Court of Oklahoma.

Sept. 30, 1958.

Rehearing Denied Nov. 12, 1958.

of salt and pepper shakers at 52¢ per pair. The parties appear here inversely to the order of their appearance in the trial court, but we shall refer to them by their trial court designation, and to Grant Manufacturing Company as Company.

Plaintiffs' petition alleged that they were the assignees for value of the business accounts of Company; that on January 18, 1954, Company and defendant entered into a written contract, a copy of which was attached, wherein it was agreed Company was to manufacture and defendant was to purchase 10,000 salt and pepper shaker sets "of a certain standard of quality," for which defendant was to pay 52¢ per set; that the contract was performed by Company, but that defendant has failed to pay the agreed price; that plaintiffs have complied with the intangible property tax laws.

Defendant's answer admitted the execution of the contract pleaded by plaintiffs; pleaded a general denial and alleged that Company breached the contract by failing to produce shakers "of the quality as to material and workmanship" required by the agreement. Defendant also cross-petitioned and alleged that he and Company entered into an agreement on April 11, 1953, wherein Company undertook to manufacture the shaker sets for 25¢ per set "according to a required standard and approved sample by Gorham Silver Company"; that the shakers manufactured under this agreement were defective and were returned to and accepted by Grant Manufacturing Company; that thereafter Company refused to comply with this contract although defendant demanded performance of it; that this breach of contract caused defendant damage in that he was unable to fulfill his agreement for the sale of the shakers to Gorham Silver Company.

As a second cause of action, defendant demanded return of $1,750 advanced Company under this first agreement. As a third cause of action defendant alleged that, as a part of the first agreement, Company had agreed to manufacture a mold for him for the manufacture of the shak-

Douglass & Wilson, H. L. Douglass, Kenneth J. Wilson, Oklahoma City, for plaintiff in error.

Jack M. Highley, Oklahoma City, for defendants in error.

PER CURIAM.

This action was commenced by defendants in error, assignees of the assets of Grant Manufacturing Company, a dissolved partnership, to recover the amount alleged to be due by virtue of a written contract with plaintiff in error whereby Grant Manufacturing Company agreed to manufacture and sell to plaintiff in error 10,000 pairs

ers which would produce two pairs per cycle; that the mold provided by Grant was defective and would not "serve the purpose as provided in said agreement"; that he paid $3,500 in advance for this mold wherefore he has been damaged. As his fourth cause of action defendant alleged that the failure of Company to comply with the original agreement necessitated a purchase by him on the open market of necessary parts of the shakers to enable him to comply with his contract with Gorham Silver Company whereby he has been damaged in a certain amount.

There was some evidence to establish the following: that plaintiffs assumed the liabilities as well as the assets of Grant Manufacturing Company; that prior to April 11, 1953, Mr. Grant and defendant negotiated concerning the production of plastic salt and pepper shakers of a certain type and quality which defendant had an agreement to sell to Gorham Silver Company; that about that date defendant entered into a contract with Company, the terms of which are contained in a letter from Company to defendant dated April 14, 1953, paragraph one of which letter provides:

"The cost of the mold is $3500. This mold will be 20 cavaties producing two complete pairs per cycle. This mold will be made of the finest tool steel; workmanship will be of the highest quality. The mold will be completely automatic useing cam action process to eject threaded parts."

and which letter also states that:

"The quality of the plastic containers produced by this mold will be in keeping with the quality and standards of workmanship of the Gorham Silver Manufacturing company * * *"

and that the price was "25¢ per pair or less"; that pursuant to this contract Mr. Grant or Company procured a mold and Company attempted to manufacture the shakers; that the first shakers produced were not of the quality provided in the contract and were returned by Gorham

Silver Company to and accepted by Grant Manufacturing Company, who did not thereafter attempt to produce an acceptable shaker under this (April 11, 1953) contract; that defendant paid for the mold as it was being made, and it was to be his property although he did not gain possession of it until after delivery of the 10,000 pairs of shakers made pursuant to the January 18, 1954, agreement.

Additional negotiations followed the attempted production of the shakers under the first agreement and, according to Mr. Grant's testimony, "We had him get some samples that would be all right and if we followed this exact sample that he had, then the parts, * * * they would be all right; and we said that we felt like we had done the work and the quality of our work was up to standard, and only if he would agree to double this price of 25 cents and make it whatever it .was, twice that much, we would go ahead and rerun again at this new price * * *." Defendant testified he agreed to the second contract thereafter so that he would be able to meet his contract with Gorham.

The contract of January 18, 1954, provided for 10,000 shaker sets at 52¢ and also provided:

"the quality and standards of the above mentioned sets will be governed by an approved sample which you have already run and which has been approved by Gorham Silver Company. This sample will be marked MVI. This approved sample will be the gage of quality to be used throughout production and all parts must be of this minimum gage of quality. It is understood that the buffing of the shrink-line of the cap will be done by R. C. Green of Wichita, Kansas and he will be responsible to deliver the proper quality of caps for this job * * *."

Pursuant to this contract Company, using the original mold, after having modified it some, produced the shaker sets and forwarded them as directed by defendant; defendant made numerous inspections of the

sets as produced; the caps of the sets manufactured by Company were not used, but defendant bought other caps to use with the shaker bodies produced by Company and finally filled his order from Gorham Silver Company. The defendant also produced testimony that the shaker sets produced under this second contract did not meet the standard of quality provided in the agreement; that parting lines were visible on the caps, but that they could be removed by buffing; that the caps furnished by Company were not buffed by Green because "it took too long"; that when operated at a slow rate of speed the mold would produce parts for the shakers of an acceptable quality, but that when operated at normal operating cycle, the mold produced parts of "a rather poor quality," not of a standard "generally accepted in the industry"; that "due to the tolerances which were not held in the manufacture of the mold" an even cycle could not be maintained; that parts produced by the mold at normal operating speeds "nearly always" have visible shrink lines which are not acceptable in the molding business; that defendant learned of the defects in the mold only after the failure of Company to comply with his second contract.

At the conclusion of the evidence, the court sustained plaintiffs' motion for a directed verdict on their petition and also sustained their demurrer to defendant's cross-petition and thereupon directed a verdict for plaintiffs for $5,200 of the amount claimed under the second contract. Defendant appeals.

In the foregoing somewhat lengthy recitation we do not purport to set out all the evidence favorable to plaintiffs, because of the nature of the questions presented. Too, we limit our discussion hereafter to those questions presented by the parties.

■ In the trial of this action, it was plaintiffs' position, to which the trial court apparently acceded, that there was only the one agreement, the last one, and that it specifically exempted plaintiffs from any

duty to provide the quality of caps contemplated by the terms of the agreement. It is on this theory alone that the result in the lower court logically can be based. We do not so interpret the contract. True, it is provided that R. C. Green "will be responsible to deliver the proper quality of caps," but this provision must be considered in connection with and not separate from the immediately prior provision that an approved sample, which was introduced in evidence, "will be the gage of quality to be used throughout production and all parts must be of this minimum gage of quality." Simmons v. Fariss, Okl., 289 P.2d 372. These shakers, as the manufacturer knew, were to be sold to a subsidiary of Gorham Silver Company who would silver-plate them for resale to the general public. To make an acceptable product for this purpose shrink lines on the plastic products were not acceptable. To eliminate the slight shrink lines which the parties apparently contemplated might occur in the manufacturing process, it was agreed that Mr. Green would buff the caps to an acceptable quality. But certainly the contracting parties did not contemplate the total shifting of the responsibility for the quality of the manufactured product. They would not have intended that the third party would be responsible for rendering acceptable for silver-plating parts manufactured which were so lacking in quality as measured by the standard that they could not at reasonable expenditure of time and money be buffed to the requisite quality. Thus a standard gauge of quality for the shakers was agreed upon. Plaintiffs' product was supposed to pass this standard before the final buffing to the requisite quality for the purpose intended by Gorham Silver Company became the responsibility of Mr. Green. Viewed thusly, the evidence was in conflict on the quality of the caps produced, and the court erred in sustaining the motion for a directed verdict. Hales v. Henry Black, Limited, Inc., Okl., 264 P.2d 355.

■ Furthermore, defendant contends this was not one contract, but two; one

subsequent in time to the other. Thus, by whatever appellation we might choose to designate the result achieved, a matter not discussed in the briefs, it is arguable that the parties agreed that the obligation of Company to produce the shakers under the original contract was no longer binding, and that they would proceed as to this subject of the contract under a new agreement. But it is also arguable that part of the first agreement, a divisible part, possibly, had already been performed, even if defectively so. The original contract, according to defendant, provided that Grant Manufacturing Company would furnish a mold of a certain size and quality for a specified price which defendant has paid. Defendant testified that after he finally secured possession of this mold, he learned that it did not meet the agreement as to size and, although the evidence was not undisputed, also as to quality and workmanship. Here, too, the court erred by taking from the jury issues made by the pleadings upon which the evidence was in conflict.

■ A resolution of these disputed questions of fact, as well as others which are inherent in an action of this nature but which are not discussed by the parties on this appeal, must come from a jury properly instructed on the applicable law. See Wood & Co. v. Val Blatz Brewing Co., 112 Okl. 119, 240 P. 115.

The judgment is reversed and the cause remanded for a new trial.

WELCH, C. J., CORN, V. C. J., and DAVISON, HALLEY, WILLIAMS, BLACKBIRD, JACKSON and CARLILE, JJ., concur.

The Court acknowledges the aid of the Supreme Court Commission in the preparation of this opinion. After a tentative opinion was written by Commissioner James H. Nease, the cause was assigned to a Justice of this Court. Thereafter, upon report and consideration in conference, the foregoing opinion was adopted by the Court.